UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
                                                    :
UNITED STATES OF AMERICA
                                                    :          19 Cr. 765  (JSR)
                    vs.
                                                    :
BRUCE BAGLEY,
                    Defendant.        :
----------------------------------------------------X

### SENTENCING MEMORANDUM
### ON BEHALF OF BRUCE MICHAEL BAGLEY

On behalf of our client, Bruce Bagley, we respectfully submit this Memorandum in order

to advise Your Honor of several matters that the defense will raise at the time of his sentencing, to

aid in the determination of the appropriate sentence. On June 1, 2020, Mr. Bagley appeared before

Your Honor and, pursuant to a written plea agreement with the Government, entered a plea of

guilty to Counts Two and Three of the Indictment, both of which charged Money Laundering, 18

U.S.C. § 1956 (a)(3)(B).  Mr. Bagley's sentencing is scheduled to take place before Your Honor

on November 16, 2021. At that hearing, the defense will respectfully ask the Court to impose a

non-Guidelines sentence of Time Served.  At age 75 and in ill health, Bruce Bagley is facing

sentencing for his first criminal conviction, a non-violent crime.  Bruce Bagley has spent his entire

life caring for his family, and pursuing a remarkably distinguished career as a researcher, mentor,

professor, and lecturer.  He has devoted his considerable skills to sharing his knowledge of the

conditions which produce persistent rural indigence in Latin America, and has taught enlightened

methods for alleviating the entrenched patterns of poverty there.  The United States Sentencing

Guidelines fail to reflect these and the other compelling sentencing factors raised in 18 U.S.C.

Section 3553 (a).  Dr. Bagley has already suffered severe collateral consequences as the result of

this conviction, including the irreparable injury to his career, the stain on his reputation, and the

stress which affected his wife's health during the year before her death. A sentence including any prison time would gravely endanger Dr. Bagley's physical and emotional health. The following discussion will amply demonstrate that a sentence of Time Served would serve the aims of justice, and would be sufficient, but not greater than necessary, to fulfill the goals of sentencing.

A.   **_Sentencing Factors to Consider Pursuant to 18 USC § 3553(a):_**

The Parsimony Clause of  18 U.S.C. Section 3553(a) provides that "[t]he court shall in every case impose a sentence **_sufficient, but not greater than necessary_**" to achieve the purposes and goals of sentencing (emphasis supplied).  As the Court reaffirmed in _Pepper v. United States,_ 131 S. Ct. 1229, 1243 (2011), in light of the long-accepted principle that "the punishment should fit the offender and not merely the crime," the "sentencing judge [is] to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 131 S. Ct. at 1240 (quoting _Koon v. United States_, 518 U.S. 81, 113 (1996)). While the U.S. Sentencing Guidelines may be the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." _Gall v. United States_, 128 S. Ct. 586, 596-97 (2007).  The Supreme Court again reiterated that principle in _Nelson v. United States_, 555 U.S. 350, 352 (2009) by emphasizing that "[t]he Guidelines are not only _not mandatory_ on sentencing courts; they are also not to be _presumed reasonable_" (emphasis in original).  Rather, the sentencing judge is directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." Id. at 597. The result is that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." _United States v. Cavera_, 550 F.3d 180, 188 (2d Cir. 2008). As set forth below, there are many compelling reasons why the sentencing factors set forth in 18 USC § 3553(a) favor a sentence of Time Served.

1. ***Dr. Bagley's Personal Background:***

Born in Oakland, California in 1947, Bruce Michael Bagley was the middle son of the three children of James Paul Bagley, Jr. and Rose Marie McGuiness Bagley.  His father was a successful insurance executive who ultimately became President of the company, while his mother was a home-maker until she died from cancer when Bruce was thirty-five years old.  Growing up in an intact household, Bruce was an active youngster who loved to play basketball, participated in the Boy Scouts, learned to speak Spanish at an early age, and excelled in his studies at school.  Today, at age 75, Bruce looks back on his childhood as idyllic, particularly when compared to the many far less fortunate lives he has observed over the years.

As the son of a veteran of World War II, Bruce grew up taking pride in his father's military service.  But by the time Bruce enrolled at the Berkeley campus of the University of California, doubts about the legitimacy of the war in Viet Nam were beginning to mount.  When he graduated from Berkeley in 1967, he was determined to resist being sent to Viet Nam.  At that juncture, the United States had not yet put a lottery system in place, and there were few avenues to follow in avoiding the military draft.  Bruce opted to apply for the Peace Corps, and was fortunate enough to be accepted.  His entry into the Peace Corps proved to be one of the most pivotal events of his life, profoundly affecting the choices he would make in pursuing his academic career, his life-long interest in Latin America, and his marriage.

In 1968, Bruce Bagley joined the Peace Corps feeling inspired by a desire to learn about other cultures, and an idealistic goal of conquering rural poverty.  At the orientation sessions held for new Peace Corps entrants, he encountered Annette Traversie, a young Native American member of the Lakota Sioux Nation, whose only life experience was growing up on the Great Rosebud Sioux Indian Reservation in South Dakota.  She had been recruited to join the "Peace

Pipe Program" for Native Americans, and was eager to fight against high infant mortality rates. That said, she was frightened because she didn't know much Spanish at all.  Bruce, who was already very adept in Spanish, helped teach her the language. Following their training session, the Peace Corps sent both of them to Fusa Gasuga, an indigenous farming community outside of Bogota, Colombia. Their work among poverty-stricken farmers first exposed them to the roving right-wing death squads which for generations dominated the Colombian countryside with impunity, as well as the emerging agrarian rights movement which eventually morphed into the FARC.  Bruce's early exposure to the political dynamics in Colombia led to his life-long interest and expertise in the political history and economic development of South American countries. Following their Peace Corps assignments, both Annette and Bruce returned to study at U.C.L.A. in California, where he earned his Master's degree and eventually his Ph.D., while she completed her undergraduate degree. For a time they returned to Colombia to live and teach, but eventually Annette grew weary and chronically ill, so both returned to the States together.  When Bruce got a teaching/research position at the prestigious Johns Hopkins University, the couple moved to Maryland, where Annette began to work on producing  Native American documentary films. During this time, the couple decided to have a child, but Annette suffered a series of five miscarriages. It was at this critical juncture that Mr. Bagley's dedication to his wife became irrevocable: although he very much wanted children, he told Annette that she was the most important thing in his life, and that nothing else mattered as long as they stayed together.

The pair remained together for the rest of Annette's life, which ended in May 2021. Surprisingly, after the couple had given up all hope of having children, they were lucky enough to have two: Adele and Paul.  In 1987, Mr. Bagley accepted a position at the University of Miami, and for the next 32 years he built a distinguished record of stellar academic advancement. As his

impressive Curriculum Vitae attests, Bruce Bagley's career flourished as he rose through the ranks from Associate Professor at the University of Miami School of International Studies to Associate Dean in 1991.[1]  During the next ten years, the school was expanded from an institution principally involved in Graduate Studies by adding an Undergraduate curriculum as well.   By 2005, Dr. Bagley was appointed as Director of the Undergraduate and Graduate International Studies Programs and held an academic Chair. Throughout these years Mr. Bagley was not only a highly prolific author of academic books and articles, but also a frequent major speaker and lecturer at academic forums and conferences in the United States and South America. His remarkably productive record of scholarly accomplishment is documented in his extensive Curriculum Vitae. Notably, his outstanding reputation for excellence in his field is validated by letters written to the Court by highly distinguished colleagues in his field.[2] Although entrusted with important administrative duties at the University, Bruce Bagley's chief love always remained teaching his students, and guiding them to success. Over the years, a number of his students have risen to prominence in the field of International Studies, and in a rare demonstration of gratitude, many give Mr. Bagley considerable credit for their professional success.

Despite Mr. Bagley's active and demanding academic life, he basically remained a Florida "home-body" throughout the years. The two children, Adele and Paul, recall that while they were growing up, their father was the mainstay – "the oak tree" – of the family. From the time that the children were in grade school, they recall that their mother began to spend her days hanging out at local Coconut Grove jazz bars, ███████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[1] See Exhibit B
[2] See Exhibit A

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████ During this unsettling period, Mr. Bagley not only maintained his distinguished record of achievement at the University of Miami, but also tended closely to his children, alleviating their apprehensions and fears. Adele recalls that, in some ways, her father turned into the proverbial "absent-minded professor" – running out of gas when he forgot to fill the car's tank, or actually having the lights in their house turned off when he forgot to pay the utilities' bill – but even then, as a child, she understood that he was just preoccupied. Although Bruce could not afford to keep the house in which he raised his children (and still rents to this day), Bruce's two children are emphatic that, growing up, they were always made to feel cherished, well-nurtured and safe.

An unfortunate – but singularly important – turning-point in the Bagley family's life occurred in 1999, when Annette Bagley was badly injured in a car accident. Two painful back surgeries followed, for which opioid drugs were prescribed. ██████████████████████████ ████████████████████████████████████ Again, during those years, the two Bagley children thrived in school, and in retrospect they give credit to their father for being the stalwart, supportive presence in the home. ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████ The two parents settled into a peaceful, companionable life, and their daily life seemed to be going well until Annette had her first massive stroke in 2011, leading to paralysis of her left side.

Following a second disastrous stroke in 2015, Annette's grave infirmities continued to worsen.  In addition to her traumatic brain injury (TBI), multiple diseases including congestive heart failure and lung cancer caused her decline to accelerate rapidly, leading to her recent death. During those fraught years, Bruce insisted upon acting as her principal caregiver. Friends and family members alike were often amazed, but not surprised, by the degree of commitment that Mr. Bagley showed to his gravely ill wife.  Indeed, it is not uncommon for those who knew them to describe his wife Annette as "the center of his life."[3] Family members have described the disagreeable realities which Annette's daily care entailed:  Bruce began every day by discarding his wife's overnight diaper. Then, because his wife was fully paralyzed on her left side, he would lift her into place in order to use the commode.  Stroke-induced  injury had impaired Annette's sight and balance, so to use the commode – which she preferred over using a diaper, whenever possible -- she could never be left to sit up alone. Routinely, Bruce then washed out the commode, helped Annette with her toothbrush, fixed her breakfast and fed her. At lunchtime, Bruce Bagley once again prepared food and fed it to her, and then helped her take her prescribed medications. As a daily ritual, Bruce helped her apply soothing skin cream, and brushed her hair.  In order to bathe, Annette had to be wheeled to the outdoor patio and doused with a gentle hose several times each week.

Although Annette Bagley's daily life continued to deteriorate inexorably, one thing that did not diminish was Bruce Bagley's deep love for his wife.  As her condition worsened, home health-care aides would come to assist Annette for several hours during the day-time, but Bruce

---

[3] See Exhibit A, p.13

would try to arrange his schedule to work at home as much as possible. In the evenings, Bruce once again fed his wife, and would sit with her to share conversation and television.

This daily routine, while extremely demanding, is one that Mr. Bagley performed regularly and reliably during the final few years of his wife's life.  No doubt these care-giving requirements were excruciatingly disagreeable, but now, during the six months following her death, Bruce misses her companionship dreadfully, and is left feeling wretched and bereft.

2. ***Circumstances Surrounding Dr. Bagley's Involvement in the Offense***

a) **Bruce Bagley Meets** ███████████████████████████

In 2013, Bruce Bagley's noteworthy work as an expert[4] on behalf of South American citizens trying to navigate the United States' complex immigration system led  to his first contact with the man who would eventually ensnare him in the criminal conduct herein: ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████     ████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████ His American immigration attorney,

Mary Kramer, contacted Dr. Bagley to seek his assistance in ██████ case. Given his excellent credentials and expertise, Dr. Bagley was hired as part of ██████ legal team. At the immigration hearing, he gave expert testimony about the perilous conditions near the Colombian/Venezuelan border, where ████ and his family lived. ████████████████████████

---

[4] See Exhibit I, a list of the cases Dr. Bagley worked on as an expert.

███████████████████████████████████████████████████████████████████ In addition to being extremely grateful, ████ was very impressed with Dr. Bagley's knowledge of Colombian politics and history. ████ started vising Dr. Bagley at his office and asking to meet for lunch, showing a great interest in the professor's wealth of knowledge.   Dr. Bagley was characteristically patient and generous with his time; in his customary role as a teacher and mentor, he enjoyed discussing contemporary South American issues with ████

███████████████████████████████████████████████████████████

████████████████████ █████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████ ██████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████ ███████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

[5] See Exhibit C (provided under seal), Decision of Immigration Judge in connection with ████ CAT hearing, detailing ████ history as a confidential DEA informant.
[6] Exhibit C, p.23
[7] Id.
[8] Id.
[9] Exhibit C, p.22





█████ saw Dr. Bagley not only as a valued expert on South America, but also as a promising source of income. Unlike Dr. Bagley, ████ was accustomed to, and very driven by, making money. ███████████████████

███████ recognized that Dr. Bagley's expertise in immigration and South American-United States political relations could be valuable to many of the individuals with whom he often worked. He started approaching Dr. Bagley with various business proposals, most of which Dr. Bagley declined.

- The first such proposal came in 2014, when ███ attempted to hire Dr. Bagley on behalf of Kiko Gomez, a Colombian Governor. ███ offered Dr. Bagley $25,000 to write an affidavit swearing that, based upon his own academic research, Kiko Gomez was not involved in Colombia's paramilitary or its drug trafficking activities. Dr. Bagley refused this job offer because his research revealed that, in fact, Kiko Gomez *was* involved in Colombia's notorious paramilitary activities.

- Several times during their relationship, ███ asked Dr. Bagley about writing books together, the subject being ███ life experiences, particularly with the paramilitary forces in Colombia. Since ███ was functionally illiterate, however, it was understood that Dr. Bagley would be the only writer. Although ███ offered to pay Dr. Bagley $50,000.00, Dr. Bagley declined the offer.

- In around 2018, ███ presented Dr. Bagley with an opportunity for a consulting job on behalf of a candidate for President of Paraguay. Given Dr. Bagley's knowledge of political history in South America, his job would have been simply to tutor the candidate regarding pressing political issues. Again, because ███ was the broker, the payment would have been generous relative to what Dr. Bagley was accustomed to earning, but ███ would doubtless have kept a hefty "finder's fee" for himself. After an initial, exploratory telephone conference with the potential client, Dr. Bagley decided not to accept the work because it was unclear what exactly was expected of him. More importantly, it did not seem as though the candidate was forthcoming about his motives and agenda, and Paraguay's long history of authoritarian rule left Dr. Bagley feeling unpleasantly suspicious.

- In 2019, ███ approached Dr. Bagley with another opportunity to make a great deal of money as a consultant for another presidential candidate. This time the potential client, Dominguez Trujillo, was from the Dominican Republic. ███ made the introduction between the two men, and Dr. Bagley subsequently traveled to New York City to have an in-person meeting with Trujillo and ███ Like ███ other offers, Dr. Bagley felt there was something that made him very uncomfortable, and he declined the work.

b) ███ **Resurfaces as a U.S. Government Informant**

12

What Dr. Bagley did not suspect, however, was that the New York City meeting with Dominguez Trujillo was actually a "set-up" orchestrated by ███  At ███ instigation, the Southern District of New York had expended resources in order to surveil the interactions between Dr. Bagley and Trujillo, based upon informative tips and promises supplied by ███  In spite of his previous deactivation, ███ had somehow managed to slip back into his role as an "informal" confidential informant, helping to make cases for federal law enforcement by ensnaring defendants or exposing illegal financial activities. This time, ███ payout would not be in cash; he was seeking greater assurances of freedom to operate within the United States, and possibly to avoid any criminal exposure at all for himself.  Although Dr. Bagley's refusal to become involved with Trujillo must have been disappointing to ███ he nonetheless continued undaunted.

   c)   ███  **Instigates a Connection Between Dr. Bagley and Alex Saab**

███████████████████████████████████████████

███████████████████████████████████████████

███████████████  It is undisputed that ███ was Dr. Bagley's first and only connection to a wealthy international businessman named Alex Saab. When he arranged for the introduction between Dr. Bagley and Alex Saab, ███ was already acting as a broker and money launderer for Saab. ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████  ███████████████████████

████████████████████████████

   d)   ███  **Conduct and Cooperation in this Case**

_____

20  ███████

21  ███████



At some point in 2017, ▮ and Saab no longer felt it was safe for ▮ to receive Saab's

money directly. As ███ explained to Dr. Bagley ████████████████████ he had a known

history as a broker between informants and their attorneys, ████████████████████

████████████████████ ██ ████████████████████

████████████████████ ██ ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

At this point ███ had already offered Dr. Bagley work on behalf of Alex Saab. Among the

work that Dr. Bagley accepted was to meet in Colombia with Saab and his son, in order to assist

the latter with his U.S. Visa application. Dr. Bagley traveled to Colombia and consulted at the

Embassy several times as part of this job.  Although the son's U.S. Visa was ultimately denied

because of concerns about the Saab family's connections to the hostile government in Venezuela,

Dr. Bagley nonetheless expected to get paid for his professional efforts. Both Saab and ███ then

asked Dr. Bagley to stay on and do some consulting work. Specifically, Alex Saab was considering

starting a business in Guatemala, and wanted Dr. Bagley's input on risk assessment, as well as

insight into the local politics at the time. Dr. Bagley accepted the work. It was understood his rate

of payment would continue to be $1,000 per hour, and that he should limit his hours to 20 per

month. Subsequently, Saab and ███ also requested that Dr. Bagley receive additional money in

the United States, which he would thereupon wire to ███ company. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ ██ ████████████████

████████████████████ ██ ████████████████████

████████████████████████████████████████████



██████████████████████████████████████████████████████████

████████████

      ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████   ████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████   ████

even tried to orchestrate an entire new conspiracy with Dominguez Trujillo of the Dominican Republic, in order to set up Dr. Bagley. The Southern District of New York bought into ████ promises, devoting resources to set up surveillance at ████ direction.  But Dr. Bagley, who was not motivated by the lure of a great deal of money, rejected ████ job offer to work for a seemingly shady politician, thus defeating that particular attempt of ████ to deliver a defendant.

         ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████   ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████   ██████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

_____

██
██ ██████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ Notwithstanding its

obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and this Court's Individual Rules of

Practice[31], the Government delayed disclosures in this case, thus not allowing counsel to advise

Dr. Bagley on the impact of this important information in discussions about whether he should

proceed to trial or plead guilty.

### 3. *Additional Factors Which Weigh Against Any Term of Incarceration*

### a) Disparity in Treatment is Discouraged by 18 U.S.C. Section 3553(a)(6)

The prosecution of Bruce Bagley, a 75-year-old professor with no criminal history

whatsoever, appears to be deliberately selective.  The government just as easily could have

approached Dr. Bagley to seek his assistance in its investigations into Alex Saab and ██ █████

---

[30] Attached as Exhibit F (under seal)

[31] This includes the Court's rule that, "[A]bsent exceptional circumstances, Giglio Material must be disclosed four weeks prior to the date of the start of trial or guilty plea."



was experienced and eager to provide the government with the evidence it needed to prosecute Dr. Bagley. As for Alex Saab, although there has recently been clamorous publicity surrounding his extradition from Cape Verde to the United States, it remains to be seen whether he will receive any criminal conviction,                                    18 U.S.C. Section 3553(a)(6) is highly relevant here, insofar as it counsels sentencing courts to frown upon disparities in treatment afforded to similarly situated individuals. While Bruce Bagley has no co-defendants in this case, and the parallels between these three men are imperfect, it is respectfully submitted that if Dr. Bagley, the least culpable, goes to prison for this scheme devised by ▮ and Saab, the disparity in treatment will be striking.

### b) Conditions of Confinement during Covid-19

In determining a suitable sentence for Bruce Bagley in light of the § 3553(a) factors, it is appropriate for the Court to consider the conditions of confinement that he would face inside a federal Bureau of Prisons ("B.O.P.") facility, particularly during the ongoing coronavirus pandemic. In that regard, we have submitted a letter to the court from Mr. Bagley's primary care physician, Annette Fornos, M.D., of the Lennar Foundation Medical Center for Internal Medicine of Coral Gables, Florida.[32] Dr. Fornos advises that Bruce Bagley "is considered high risk for COVID-19 complications due to his age and medical conditions," which she then lists for the

---

[32] See exhibit G

court's guidance. His heightened risks for vulnerability to COVID-19 include, *inter alia*, pulmonary nodules, diabetes and hypertension.[33]

It is noteworthy that, in recent months, courts in this District have repeatedly held that "the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals." *United States v. Jones*, No. 15 Cr. 95, Dkt. No. 2865, at 6 (S.D.N.Y., May 26, 2020) (Nathan, J.); *see also United States v. Gross*, No. 15 Cr. 769, 2020 WL 1673244, at *2 (S.D.N.Y., Apr. 6, 2020)(Nathan, J.,); *United States v. Nkanga*, 450 F. Supp. 3d 491, 492  (S.D.N.Y. 2020) (Furman, J.); and  *U.S. v. Lizardi*, No. 11 Cr. 1032, Dkt. No. 2523, at 8 (S.D.N.Y. 2020) (Engelmayer, J.). Consequently, courts have granted variances at sentencing on the basis of harsh and dangerous conditions at B.O.P. detention facilities, especially during the continuing pandemic. See, e.g., *United States v. Polanco*, 20 Cr. 94 (S.D.N.Y.) (Nathan, J.) (sentence of time-served, four-and-a-half months, for illegal reentry and false statement to an ICE officer, a variance from Guidelines of 10-16 months based in part on conditions at the MDC during the pandemic and the likelihood that the defendant would remain detained until deported); *United States v. Paez Vazquez*, 20 Cr. 28 (Oetken, J.) (sentence of time served, approximately six months, despite Guidelines range of 87-108 months, taking into account difficult conditions at the MCC during the pandemic); *United States v. Morgan*, 19 Cr. 209  (S.D.N.Y.) (Berman, J.), (brutal conditions of incarceration, both before and during pandemic, result in sentence of time served -- less than 15 months -- where stipulated Guidelines range was 33-41 months and actual applicable Guidelines range was 41-51 months); *United States v. Casillas*, 19 Cr. 863 (S.D.N.Y.) (Broderick, J.) (time-served sentence of approximately five months where Guidelines range was 15-21 months, largely based upon conditions at MCC during the pandemic); *United States v. Pierson*, 14 Cr. 855

---

[33] Id.

(S.D.N.Y.) (Swain, J.) (time-served sentence of less than two months where Guidelines advised 6-12 twelve months). During one recent sentencing, the Honorable Analisa Torres (S.D.N.Y.) explained that her decision to impose a time-served sentence of three months, where the Guidelines suggested 5-11 months, rested in part on the reality that detention for three months during "ordinary times is very different from being detained for three months during the COVID-19 pandemic" due to "additional burdens, including increased risk of infection, along with other complications such as the suspension of legal and family visits." *United States v. Rivera*, 16 Cr. 66 (S.D.N.Y.) (AT).

The COVID-19 pandemic has significantly affected the sentencing decisions of numerous Judges. Not only has the pandemic affected the analysis of factors to be weighed under 18 U.S.C. § 3553(a), but also, this highly infectious disease has made detention at federal prisons far more harsh than "normal." For months, inmates have been required to remain inside; they have been subject to strict limitations on family visits and attorney contacts; their access to phone calls and email has been curtailed; and for long stretches, most have been locked down in their cells for 23 hours per day. While it recently began to appear that enforcement of such stringent measures could be relaxed, the B.O.P. has once again been  forced to re-impose measures to stop the accelerated spread of dangerously communicable COVID-19 variants.  In some facilities, food preparation has been adversely affected by short-staffing and acquisition difficulties; consequently, inmates have reported receiving cold cut sandwiches for every lunch and dinner.  Reports persist that inmates are not getting exercise, they are not receiving normal health treatment, and all educational programming has stopped. These restrictions, as well as the pervasive fear of COVID-19 (especially new variants), make time spent in prison during this crisis many times harder.

As U.S. District Judge Paul A. Engelmayer recently explained, "[a] day spent in prison

under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing." U.S. v. *Lizardi*, 11 Cr. 1032-55, Dkt. No. 2523, at 7-8 (S.D.N.Y., 2020) (releasing defendant with no known underlying health conditions, concluding that the combination of COVID, related jail conditions, the relatively short period left on defendant's sentence, and other 3553(a) factors constituted extraordinary and compelling circumstances which warranted release).

c) **Bruce Bagley's Health is Substantially Compromised**

█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

[34] See Exhibit G (under seal)



### 4. *Pre-Sentence Report*

Although the applicable Guidelines range was properly calculated in the Plea Agreement and the Pre-Sentence Report (PSR), this range does not properly reflect the true measure of Dr. Bagley's culpability, because it is driven principally by the loss enhancement. Courts have long criticized the practice of using the Sentencing Guidelines' loss enhancement provisions as a proxy for determining the seriousness of the offense. The Guidelines' loss enhancement section was developed "without the benefit of empirical study of actual fraud sentences by the Sentencing Commission." *U.S. v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J. concurring); *see*

---

[35] See Exhibit J, letters from Dr. Carol Ann Killian, explaining Bruce Bagley's medical conditions. (under seal)

*also U.S. v. Musgrave*, 647 F. App'x 529, 538-39 (6th cir. May 4, 2016)("there is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances"). The consequence of this lack of an empirical basis for determining the loss, combined with the often-disproportionate role that loss plays in determining the Guidelines sentence, is that "sentencing judges are discouraged from undertaking close examination of the circumstances of the offense and the background and characteristics of the offender." *U.S. v. Corsey*, 723 F.3d at 380 (Underhill, J. concurring). Here, the loss enhancement is responsible for 16 levels of Dr. Bagley's offense level, but the amount of money that Dr. Bagley retained in 2019 ($64,000.00) for his consulting services was roughly 2.2% of the $2,971,279.00 that he is being held legally responsible for under the Sentencing Guidelines. The Guidelines attribute that degree of loss to Dr. Bagley because that is the amount that ███ directed Saab to wire to Dr. Bagley in 2017. ███ ███ ████████

███████████████████████████████████████ ██ ████████

██████████████████████████ ██ █████████████

████████████████████

 While we appreciate that the PSR recommends a sentencing variance of twelve months' imprisonment – well below the calculated Guideline Range – that recommendation was made before the development of Dr. Bagley's recent serious health problems. The PSR quotes Dr. Bagley's own assessment of his current physical health as "reasonably good" (PSR ¶64), but since that interview with Probation, Dr. Bagley's health has deteriorated drastically, as discussed above. Additionally, the PSR's recommendation was influenced by Dr. Bagley's characteristic tendency to brush aside his own health complaints.  If asked today, he would likely reply that he is doing "pretty well," ███████████████████████████████████████

██████████████████████

In its justification, Probation questions whether its credible that, prior to January 2019, Dr. Bagley had no personal knowledge from ███ or any other source that the money Saab was wiring him was from corrupt operations in Venezuela. Probation is basing this concern on Dr. Bagley's years of teaching international studies and authoring books on drug trafficking and organized crime. Probation does not explain how Dr. Bagley's professional background would provide him with specific knowledge about Saab's business in Venezuela being corrupt; a business that, the government agrees, Dr. Bagley himself had no connection to or interaction with. Prior to December 2018, Dr. Bagley did confirm that Saab was not indicted in the United States or anywhere else and that Alex Saab was not on the Office of Foreign Assets Control (OFAC) list.

### a) <u>Objections</u>

Dr. Bagley was extremely forthcoming during his presentence interview and provided the basis for most of his objections to the PSR. (PSR ¶¶33-39). The following objections are identified by the corresponding paragraph of the PSR:

13. Dr. Bagley does not recall ever opening a bank account in Weston, Florida at any point.

18. Dr. Bagley was hired by ███ and Alex Saab to provide consulting services. He provided those services and the money that Dr. Bagley transferred to his personal account represented payment for his services.

### <u>CONCLUSION</u>

For all of the foregoing reasons, we respectfully ask the Court to grant Bruce Bagley a sentence of Time Served. Dr. Bagley has spent his entire adult life providing and caring for his family, while building a dedicated career as a researcher, mentor, professor and lecturer. From the time that he graduated from college and entered the Peace Corps at age 21, he has endeavored to

help alleviate adverse conditions in impoverished South American communities.  Given Bruce Bagley's advanced age, declining health and complete lack of any criminal history, it is altogether reasonable to predict that he will never be a repeat offender.  Certainly the required period of Supervised Release would give the Court sufficient opportunity to monitor his behavior and impose any corrective measures, in the highly unlikely event they are needed. In determining the appropriate sentence, we respectfully ask the Court to note that Bruce Bagley has already suffered detrimental results from this conviction which far exceed any punishment the Court could impose. The collateral consequences of this conviction have already been astronomical:  His distinguished academic reputation was damaged, and he was required to take early retirement and thus give up his prestigious career.  Ever since the early morning hours of  November 18, 2019, when Dr. Bagley and his wife were woken by federal agents pounding on their door, his chief concern was for his terminally ill wife.  As she watched agents place him in handcuffs and interrogate him in his underwear, Dr. Bagley worried that she would never recover from her shock and distress. Today, he is overwhelmed by dark thoughts that his arrest in fact hastened her death.  Dr. Bagley's loss of his companion of fifty-three years has been so profound that his children are convinced that any prison time may well amount to a sentence of life.  WHEREFORE, it is respectfully submitted that a sentence of Time Served would be sufficient, but not greater than necessary, to achieve the goals of sentencing herein.

Thank you very much for your consideration of this submission.

Dated:  New York, New York
        November 9, 2021                                    Respectfully submitted,

                                                            *Peter E. Quijano*

                                                            Peter Enrique Quijano, Esq.

*On the Memorandum:*

Anna N. Sideris
Nancy Lee Ennis


cc.:    A.U.S.A. Nathan M. Rehn
        A.U.S.A. Sebastian Swett
        U.S.P.O. Christopher F. Paragano